This is the United States v. Williams et al. Mr. Goldberger, how are you? I'm well, thank you very much. May it please the court, my name is Peter Goldberger and it's my privilege to represent my client Mark Hernandez and his co-appellants with respect to two of the issues on which the court has invited argument. The closed courtroom during voir dire and the financial issues, the assessment of costs and so forth. Can we start with the closed courtroom? Mark Hernandez Yes, just to review quickly how we're going to structure the time if you don't mind. So my co-counsel Dan Mission will follow talking about the sufficiency issues and John Yanninick will speak briefly about his separate issue about exclusion, an issue in his brief, not on your letter. Peter Goldberger On the Batson issue. Mark Hernandez Yes, about Batson objection being heard in chambers without all counsel present. So the plan is for me to present rebuttal for all and for that reason I'd like to reserve two minutes of my 14 for rebuttal. Thank you. And of course I'm happy to try to answer questions on anything of the 25 issues in the den briefs and my co-counsel are here, CJA counsel for the co-appellants and if a question should arise about a particular appellant they're available on their own cases. So with respect to the closed courtroom during voir dire, common ground is a structural error in violation of the Sixth Amendment and that point has been settled since the Supreme Court decided the Presley case almost 20 years ago, more than 15 years before this trial began. And yet in disregard of that settled precedent, Judge Cain issued an order which I interpret the docket as being the afternoon of the Friday before the Monday when voir dire began. Mr. Goldberger, is there anything in the record, I've looked for it, is there anything in the record that indicates why that order was entered at that time? There is an inference that can be drawn from the record that because of the large number of defendants and the nature of the charges there was an increased courtroom security presence. So there was not only a large number of potential jurors but also more marshals than usual in the courtroom. So based on my experience I inferred a request from the marshals to the court, to chambers, to close the courtroom. Was there any objection by any defense attorney at any time? So no one, I mean, first of all you can imagine this happening, a Friday afternoon, there's a big trial starting on Monday, there's going to be jury selection, it could last a couple of days, it ended up lasting two days. The district court judge, I mean, she didn't pull this order out of her bonnet. Correct. There had to be some prior discussion. It's a written order, that's unusual. I mean I've had a number of cases like this, I've never seen one with a written order. There's this written order, it's brief, it's specific, but there's nothing else there. And it's unconstitutional. You said there's an inference. It's brief, it's specific, and it's unconstitutional. Well that's why we're here. Yes, yes, and I think the government agrees with us that it is unconstitutional, that you cannot say this courtroom is closed unless somebody persuades me otherwise. That's the opposite of the constitutional rule. And there were no alternatives considered by the judge, at least not on the record with respect to alternatives to closing or shutting it down altogether, right? So even longer ago than Presley, you have the Waller v. Georgia case 25 years ago, 30 years ago, which said a judge to enter such an order must consider these factors and make findings of alternatives, necessity, and so forth. But nobody objected. Unfortunately, no one objected. No one objected on Friday. No one looked around on Monday and said, Jesus, courtroom's closed. No one looked around on Tuesday and said, this courtroom's closed, we ought to object. No one looked around during the seven weeks and put on the record that, you know, we need to establish why this courtroom was closed during jury selection. So I infer. Now you want us to order a new seven week trial. No, I want you to vacate the verdicts in this trial and see what happens. But couldn't an inference be made that because there was no objection, the attorneys had a reason for not objecting? No. I mean, I think the most reasonable inference is busy trial lawyers. So I mean, I don't want to go out too far outside of the record, but I think trial lawyers obsessed with obsessed with trial preparation for a mammoth trial, juggling all the jury questionnaires, crowded courtroom. Just it was it didn't come to the forefront of their minds. Mr. Goldberg, you're there's this is structural error. I don't think anybody disagrees with the fact that under the Supreme Court precedent, this is structural error. And however it happened, it happened. And whatever the record shows, it doesn't show too much. And that's what we're constrained with. How do we evaluate a structural error question? That's really the issue. I interpreted the letter inviting argument on this to be this question. How does the plain error rule interplay with this kind of structural error? That's the question. How plain error would apply. That's I think that's the question. So the government concedes the first two points. There was error. The error is obvious. Even though the judge took the lawyers overlooked it, it's obvious in the plain error sense. Obvious under settled precedent. Right. So the question is, how did the third and fourth prongs play? Is there a prejudice requirement? What does it mean to say that this error affected substantial rights, which under the plain error rules a burden on us? And then finally, even if there was an effect on substantial rights, would the court exercise its discretion to reverse? And I think in a way, Judge Fisher, you're already hinting at that, saying you're considering the cost of the reversal. It would be a factor. But because the very fact that the error is structural, it puts means it cannot be lightly brushed aside against. Of course, against cost and consequences. Right. So does it affect substantial rights? Let's start there. Does it affect substantial rights? I say it clearly does. And this is the kind of effect on substantial rights that the court in Olano talked about is some can be established in some way other than by proving prejudice. Which rights? Which substantial rights? The right to a public trial under the Sixth Amendment. The defendant's right, the one they have standing to raise. It happens to be coincident with the public's right to access to the courtroom under the First Amendment. Your argument is tethered to the Sixth Amendment, correct? That's the one we have standing to raise. I wish I could, you know, also speak for the family who were, honestly, there's family sitting here who came from New York to hear this argument. It is implausible that they were not stuck out in the hallway as their loved one's trial began. But it's clear that that order only applied Monday and Tuesday. Yes, that's correct. Only for jury selection. That's right. So what does it mean to affect substantial rights in this context? It was a complete deprivation of a constitutional right which is not tethered to the fairness of the verdict. Right. So it's that kind of right where we shouldn't have to prove prejudice in the sense of impact on the verdict to win. And the prejudice is the deprivation of rights is a total deprivation of a right which is about the appearance of fairness of American trials. And that's so that right was completely deprived. And that right was totally affected insofar as this stage of the case was concerned. Is there a difference to be made between folks that raised this on direct appeal and folks that didn't? Because not everybody joins this argument. It affects everyone and I hope you would extend any favorable decision to every to every appellant. I can't imagine that somebody would have intentionally disavowed this argument if it was going to be. Well, a lot of people join different arguments and briefs. Not everybody joined this argument. I don't have a chart of that in front of me. I was not aware that not everyone had joined it. I would think that they would have. What about people that didn't appeal the verdict? That's there. They're in the posture of the petitioner in Weaver versus Massachusetts from a couple of years ago in the Supreme Court that said, when you come up on post conviction through ineffective assistance, you have to prove prejudice. Right. So that's the difference. We are in between Presley and Weaver. Right. If you want to put it that way. Right. So I would say we have a total. So I would I would then refer to the category of plain errors that Judge Becker raised in the same case about constructive amendments where he said, there are some errors, structural errors, which in which there should be a presumption of prejudice. Basically, you flip the burden back to the government. That was dicta in that case, though, wasn't it? You probably helped write that. Help draft that opinion. No, I wrote the brief. That was my argument. That was my that was my client. Not I suppose that was post clerkship. Yes. Yes. I don't. Well, because because he said we had an effect on substantial rights on that count. We won a reversal on that count. The I think the better way to look at it is on the fourth prong, the discretion. Right. And here the factors that would go to the court's reputation, integrity, public perception of fairness are the Waller factors to start with. When you have when the judge has struck out on every one of the Waller factors, that is, it's a complete closure. It's not this person or that person was unreasonably excluded. The courtroom was locked. It extended not for a brief time, like the U.S. versus LNU, the most recent case in this court where it was one form of evidence that wasn't made public during the trial, but was the entirety of the two days of war here, which under Presley is we look at separately as a piece of the trial where there was no justification given. Whatever, no evidence of weighing of alternatives, no evidence that alternatives were unavailable. Wasn't couldn't you brought in half these people at one time? Couldn't you reserve half a row for family members? All those things that a judge would consider. None of that. All we have is the most egregious possible violation short of one where the lawyers would say objection and the judge says overruled. That would be the only kind of object. And then we wouldn't be in plain error. So. On the fourth prong, I think we make a strong case that that it's time for the court to send if the district judges are not focused on this constitutional right that's been established for decades. If this would be an appropriate case to enforce that right through the player and say it is structural and for the very reasons that it is structural and obvious, the right is substantially impaired and the integrity of the courts require that it be enforced, not brushed aside. There's no middle ground. My my time is up. I'd like to say a word on the costs and fees. If you have the time for that. So the government has conceded. But I think it's unclear what the concession is with respect to court costs. In the red brief, they filed the big red brief. They fall on most of the appeals. They say they're conceding the marshal, the police overtime, the police overtime. But in the separate brief, they responded to Mr. Shoeb. They say they're conceding the overtime and the marshal's witness fees. So I'm not clear what they can clarify that and you can address no rebuttal. Right. So but what I'm saying is this is an area of law in which there's no Third Circuit law. It would be good to write something. And what I would like to hear and I'd like to hear is this is part of the sentence. It has to have a clear statutory basis. It has to be raised in writing before sentencing so that people have a chance to look at it and think about it. The shoot. And there were three. The last thing is that there are three defendants who are acquitted of the Rico, one of whom was also acquitted of the drug conspiracy. That being Mr. Williams. But Rice and Shoeb also were acquitted of the Rico. And yet they got the same joint and several liability for financial penalties, including restitution for the funeral costs of murder victims. And they object to that as being unreasonable to have joint and several liability without regard to what people were convicted of and held liable for. And I think they make a good point, especially in light of Nelson versus Colorado, that says once you're you're acquitted, you can't be faced with any court costs that relate to that account. Thank you. Thank you. Don't go anywhere. I did have one question. I'm sorry. I did have one question for you on the fourth prong. Can you comment on Weaver? Yes. So Weaver is a post conviction case. It's not a direct appeal case. So make a difference. Yes. So there is no on the fourth prong. Does it make it? Yes. Because there's no analogous requirement of showing there's no discretion on a post conviction. You either meet the requirements. In that case, the defendant was unable. And in fact, the dissenter said no defendant would ever be able to meet to prove prejudice under Strickland from the lawyer's failure to to object. So the protection here, if you're talking about cost to the system, the protection is the Supreme Court has closed that door. You either object when you should at the time of the closure or you notice it and bring it up on appeal. And if you don't, you're done. Doesn't the fundamental fairness argument. Doesn't it have some importance from from the Weaver, the fundamental fairness language from Weaver? Well, Weaver was focused. Once Justice Kennedy got through the distinctions that I'm making, the court is focused on the fundamental fairness in so far as it is enforced through ineffective assistance, which requires proof of an effect on the outcome. So we're not saying the trial was rendered that we could show the trial was rendered fundamentally unfair by the closing of the courtroom in terms of its outcome on the verdict. But I will say when you have a courtroom full of of marshals and no family present, jurors might notice that and wonder about these defendants. So I think that goes to the public perception of fairness, that that should affect the fourth prong. Thank you. Thank you. Mr. Martian. Morning. Good morning. Judge Estrepo, members of the court. By the way, my name is Mission. If I screw up. My apologies. No, no, no apologies necessary. Judges. Is admission impossible? Very much so. Yes. Although that irritated me when I was a child. You've had a few of those missions in practice, I'm sure. I have. My father practiced ahead of me for many years. Retired 10 years ago now. Your Honor, I'm here. I represented Anthony Sistrunk at trial, and I'm here on behalf of all 10 defendants to address this court's concerns regarding the sufficiency of the evidence argument. Judge Fisher, your opinion in row is the one we're, of course, relying upon. And as you are well aware, this is a situation where the court cannot consolidate all of these various disparate and disconnected events in order to meet the drug threshold. One of the things that we are asking for is that this court vacate the sentence as to count three and remand for resentencing with that 20 year statutory cap. We believe the court should also vacate count two for the same reason and count one, the recall offense, for the very same reason. And before I get to that, I want to address that issue. But before I get there, I want to make it clear to correct and clarify the record. The government in its brief took the position that no defendant preserved the issue regarding the sufficiency of the evidence as to drug weight. That is not true. In fact, I raised that very issue in my rule 29 motion when I made a, an argument that the government failed to show so much as even that Mr. was responsible for so much as even an eight ball distribution of drugs and a 100 gram distribution of drugs. I did that on day 24 and it will be found in the original transcript at page 5255. Once I made that objection, Judge Kane's September 23rd order, September 23rd of 2015, found in the middle district docket at document number 746, indicated that any objection made on behalf of any single defendant should apply to all the remaining defendants at trial. And so therefore, all of the remaining co-defendants would be entitled to this same objection. Of course, that makes a huge difference in terms of the, which part of rule 52 applies to this appeal, whether we should get the harmless air standard under 52A or the plain air standard under rule 52B. And where that makes the biggest difference is the fact that the burden of persuasion remains on the government and not on the defendants. Now, alternatively, if the court were to consider that we have not properly preserved that review, we believe we're still entitled to appellate review under the plain air standard. And we refer to the things that Mr. Goldberger was just talking about in terms of the three, actually four-pronged test under U.S. versus Olano. And the government has, rightfully so, conceded those first two issues. Clearly there was air. Clearly the air is plain. The question then becomes whether or not it affects the defendant's substantial rights. I can't imagine anything more substantial than facing a life in prison penalty rather than a penalty with a statutory maximum of 20 years. Moreover, inasmuch as the government has failed to sustain their burden of proof, the evidence was insufficient as to the larger quantity drug amounts, these defendants faced a fairness and integrity and a public reputation situation where this judgment at life for four of these defendants and 30 plus years for two of the defendants and 25 years for the seventh defendant, this is clearly unfair. So we meet the standard under the plain air standard. Now, there are a number of situations throughout the record, and I would refer this court to the individual defendant's briefs. But each and every one of these defendants can point in the record, and they have in their briefs, as to the fact that the government failed to show that these defendants transacted or distributed drugs in these quantities. Mr. Sistrunk, there were three witnesses who testified his drug dealing activities. None of them mentioned drug weight. None of them even mentioned drug type. Mr. Methods here on behalf of Douglas Kelly. There were three eight ball deliveries there. And three witnesses, Corderos Rogers, Darvin Allen, and Willie Haywood testified to those eight ball deliveries from Mr. Kelly. Also, there were three police officers who testified about drug distribution by Mr. Kelly. Detective Schaefer, Officer Hoover, and Special Agent Laprelle. Again, all were eight ball quantities, 3.5 grams, 4 grams. None of them in any way, shape, manner, or form ever approached the thresholds necessary to invoke the greater penalties. Ms. Harper is here on behalf of Mr. Villega. And at sentencing, Ms. Harper raised the issue that the total drug weight that Mr. Villega was responsible for was 60 grams. Again, well below the standard. Your Honor, I'd like to turn to the issue of how this applies to count two and how this same argument applies to count one. The RICO offense at 1963A has a maximum statutory penalty of 20 years unless or until the underlying RICO, the underlying offense is one that carries a life penalty. If count three, if at count three these defendants were not engaged in a situation under row where they could be found guilty of a life penalty, then clearly as to the RICO offense at count one, that statutory maximum has to be 20 years. So it's not an insufficiency argument, it's a cap on the statutory maximum. Cap on the maximum, Your Honor. I understood you earlier, there's an insufficiency argument there. It's a cap on the exposure. I'm trying to, I'm trying to transition from what the court was concerned about to one of the issues that we feel is very important. And that is that this applies to all three counts. I understand. This court is also concerned, naturally, about the underlying drug trafficking conspiracy at count two. And that's different than a simple, excuse me, a simple distribution case. Judge Fisher's opinion addressed one of those things when he distinguished in row between distribution and possession with intent to distribute. And that did not appear to affect the court's decision at that time. But more fundamentally, the government failed to prevent, excuse me, the government failed to present evidence that was sufficient to show that the overarching conspiracy that these defendants engaged in was that to transact in five kilograms of cocaine or 280 grams of crack cocaine. In fact, what this government evidence showed was that these defendants were engaged in a buyer-seller relationship, more akin to what was discussed in Gibbs and more akin to what was discussed in Pressler. None of the factors that the court used to determine that Gibbs was involved in a conspiracy or that they used to say that Shreffler was not involved in the Pressler case. None of those factors are here. These defendants did not pull their money. There was no, the trial was replete with evidence that every man was for himself, that there was no shot caller, there was no boss. There was references to James Abney being the king of the South, but nobody had to pay a token to him. Nobody paid a price to get permission to deal on a drug corner. And that's a distinction that makes a difference here. So we believe I see that I'm out of time. The defendants, the appellants here believe that the government has failed to demonstrate that these defendants agreed to transact in the larger quantities necessary to invoke the life penalty. And when we look at what they did in count three, of course, that penalty for an 841 offense applies to a conspiracy in 846 offense. So we believe that the sentences passed at all three counts, three, then two, then one, must be capped at 20 years. We asked this court to remand for resentencing in accordance with that. Do you? If you're on six, if you're unsuccessful, we disagree with you on your arguments on count two and count one. OK, OK. Can you the row problem with count three affect your clients and the other two joined in? Can it affect their substantial rights? Your Honor, we believe it did. We believe the government's brief raised the consolidated, the concurrent sentence doctrine, which has been abolished. We believe this is very important that the court understand that it makes a difference because count three, the distribution charge, if they have not distributed drugs in that quantity, you then next look at count two, did they conspire? Did these defendants agree one with another to transact in these larger five kilogram and 280 gram quantities? If they have not, then that sentence falls to a 20 year cap. And if both sentences have a 20 year cap, then clearly the RICO offense at count one under 1963A falls to a 20 year cap as well. So it is a substantial prejudice that they suffered all along. But where we disagree with what the government is saying is the government takes the position. Oh, these defendants were convicted at the of the RICO offense and that's a life penalty. And who cares about the other two? That's not the proper way that we respectfully suggest you look at this. Instead, you have to look at this as what did they agree to do? What what evidence went to show what they did? And when both come up less than the five kilograms and less than the 280 grams, count one has to reduce to 20 as well. OK, thank you. Nothing further. Thank you very much.  Is it Yannick? Yannick. How are you? Good, Your Honor. May it please the court. John Yannick, my client was Maurice Atkinson. You've got a life sentence. I believe my issue where I've talked about in my brief about the secret hearing during the tail end of Wadir somewhat dovetails with the argument. During the closed courtroom. It dovetails with the closed courtroom argument because essentially what happens. There's double closure. Exactly. So we're at the end of Wadir. Both sides exercise their preemptory challenges. The judge recesses. At that point, unbeknownst to 10 of the 12 defense counsel, counsel for Cruz and Hernandez accompany the prosecutor, Mr. Houser, into the into the judge's chambers with a court reporter and they litigate a Batson issue. Essentially, juror number three, Mr. Avila, was Hispanic. There was questions about, you know, whether or not there was a race neutral reason provided for this. And all this went on outside the presence of the 10 other lawyers and one where the courtroom was in recess. Was a transcript made available to the attorneys? Not at that time, Your Honor. No one knew about it. We reconvened into courtroom and the judge asked all of the parties, is the jury sufficient? At that point, I got up and raised. I went to sidebar and I said, well, I have a Batson issue. And the judge basically told me that it's already been decided. So at that point, she explained to me what had been what occurred outside the courtroom. I didn't have a transcript. I objected. I said my client wasn't there. I didn't have an opportunity to, you know, see what was going on. Look at the demeanor of Mr. Houser, who provided this explanation. Did the clients go back into the judge's chambers or just the attorneys? I don't believe the clients did, Your Honor. I only had the transcript. We only really understood it after we got the transcript. It appears that Mr. Houser, attorney for Mr. Cruz and attorney for Mr. Hernandez went back with the judge in her chambers along with the court reporter. And no defendant was present for that conversation? As far as I understand, no defendant was present. And if the court is interested in closing the courtroom, this is like a super closure. It's a star chamber. And I think, if anything, the court needs to give us a new trial on that basis. My time is up. Thank you. Is it Consiglio? Good morning, sir. Good morning, Your Honor. I'm Mike Consiglio on behalf of the United States. I'd like to focus on what appears to be the most important issue, is the courtroom closure. And the parties agree that the plain error test applies here. Plain error test obviously has four components. The government's not contesting that this was error. The government's not contesting that this was plain and obvious. With respect to whether... Not contesting obviously it was a structural error. Not contesting that it was a structural error. We are contesting whether this affected substantial rights. And we've heard some argument in some briefing, which is suggesting and actually coming to the point that this is almost an automatic violation of substantial rights when there is a structural error. And we are not conceding that. Had there been an objection, it would have been an automatic reversal, right? I would agree with that, Your Honor. And I think even the Supreme Court in Weaver says something along those lines, that if it's objected to in a timely fashion, it would have been subject to reversal at that time. Some of the complication associated with assessing plain error and whether it applies can best be assessed by handling the fourth prong of plain error as to whether this error, whether it seriously affects the fairness and public reputation and integrity of these judicial proceedings. And I respectfully submit to the court looking at the facts of how this court closure occurred, that it did not affect the fairness, the public reputation, integrity of the judicial proceedings. And I ask the court to consider, it's hard to determine from a cold record all the circumstances of what was taking place in this courtroom. But this was a seven-week trial. And this was a seven-week trial with over 200 witnesses testifying. There was 12 defendants and 12 counsel and additional counsels. There was co-counsel who participated in the process and staff who assisted in this matter. The closure occurred for two days. It was two days of an important juncture, which is obviously jury selection, but it was two days of a seven-week trial. And considering the remedy associated with plain error, it would be impugning the public reputation and fairness and integrity of the entire process and the entire result. But focusing on the court closure itself, I respectfully ask the court to consider a couple of circumstances. The Supreme Court in Weaver. It is an ineffective assistance of counsel case, but what the Supreme Court had to do in Weaver was address prejudice. And in addressing prejudice was trying to figure out how do we measure prejudice in a structural error context. And for argument purposes, the court focused in on a hypothetical that was brought forth by the defense counsel. Can there be prejudice if a trial is deemed fundamentally unfair? That was the last part of Justice Kennedy's decision, is an analysis of whether closing a courtroom during voir dire can render a trial fundamentally unfair. And when the Supreme Court reviewed the facts of Weaver, it found that that trial was not fundamentally unfair. And I respectfully ask the court to consider the facts and circumstances of Weaver and say, is fundamental unfairness as a... Who closed the courtroom in Weaver? I'm sorry? Who closed the courtroom in Weaver? And that is an important distinction. The court officer. The court officer. This was a judge. This was a judge. Without consulting anybody. Shut it all down. And the government recognizes that this is different because the court did it. Although the practical effect is the same. As far as... There's a very significant distinction between a court officer doing something probably unbeknownst to a judge and the judge in the trial closing the courtroom without consulting and without even considering on the record alternatives to closing the courtroom. And it would have been more than helpful. It would have been, obviously, the duty of those folks involved to object so that we could walk... What about the United States' responsibility? Should they have objected? I mean, isn't it in the United States' interest to have open trials? It is. And it would have been appropriate for either side to have objected under the circumstances. And I would ask the court to consider one side issue, which is... It's not a side issue because it deals directly with jury selection, but it's not clearly evident from the docket and the record, which reflects why a simultaneous objection is essential to a fair operation of justice. Defense counsel for Mr. Cruz filed a pretrial motion challenging the veneer panel, whether it was demographically fair and appropriate under the circumstances. The government... The defendant filed a motion and asked for discovery from the clerk's office as to how the jury panel was made up. Defense counsel raised this issue. We objected and conceded to a certain point and the trial judge, Judge Cain, granted the motion in part. After further consideration and further discussion from the government and the defense, Judge Cain backed off and granted greater access to this information. And the result of the parties litigating and discussing this matter before the trial judge resulted in this discovery material being disclosed. And when the discovery material was disclosed as to how the jury panel was made up, the defendant ended up withdrawing the motion saying that the jury veneer was improperly reflected because, in fact, there was no prejudice associated with it. In fact, the numbers were beneficial to certain groups as opposed to... And I only highlight this issue because what it reflects is the importance of a simultaneous and timely objection. It allows a judge... There's a transcript of the jury selection. Yes, there is. And in the transcript of the jury selection, it's clear that although it was not public, that the public was not available to observe that portion of the proceedings, it is also clear that it was a very fair proceeding. This was not like Weaver where there was a defendant and defense counsel and... A very fair proceeding where the judge entertains bats and strikes in chambers, ex parte of everybody else. That's your perspective on a fair proceeding? And I respectfully disagree with defense counsel's summarization of how that occurred. If you look closely at the record, I believe what happened was there was a batsman challenge raised by defendant Cruz. Defendant Cruz's counsel approached at sidebar and raised this issue, which is normal in batsman challenge circumstances to go through these factors at sidebar. It was defense counsel for Mr. Williams who joined Mr. Cruz at sidebar to address this issue. So it was two counsel. Mr. Williams' counsel took a seat and then defendant Hernandez joined Mr. Cruz and the judge going back into chambers to discuss this. This was while the jury selection was going on and the court specifically addresses to the entire courtroom, the panel that was there, as well as defense counsel, I'm going to take up the matter that Mr. Cruz has just raised in chambers. At that point, defense counsel for Mr. Atkinson had to say, what is this objection? What are you doing? Can I participate? That, just like any other sidebar objection and matter that handled throughout the entire trial, just like here, it just didn't happen at the sidebar. It happened in chambers. More importantly, with respect to preserving that issue, was the fairness with which judge Cain handled this once defense counsel raised his concern. She said, this is what happened. This is what the Watson challenge was and the basis for my ruling and this is how I got to that point. It wasn't simply an answer from the judge saying I deny your objection. It was, here's the reasons and I think the reasons goes on for a couple of pages of transcript and the defense response after hearing that wasn't, I would like to hear from Mr. Houser to see his facial expression as to why he gave this, why he objected to this particular juror. This question was, essentially, I just want to get this on the record was the issue that was raised. That type of handling and analysis of problems was consistent throughout this trial with the judge. It was a fundamentally fair proceeding. One fact that I do want to highlight for the court, which might not be evident, in Weaver, there was a defendant and defense counsel. His mom and his minister were locked outside. There was some discussion in the Supreme Court about whether the possibility of having some members of the public present in the courtroom would inspire potential veneer, potential jurors to be more honest and trustworthy in their answer to questions. That's very different than what was happening in this case. In this case, there was 12 defendants. There was at least 12 lawyers. There was a privately hired courtroom consultant for picking the jury. There was staff. All totaled, there was at least 25 people, if not more, in the defense side in excruciating detail going over questionnaires, in excruciating detail questioning each member of the potential jury and the veneer panel over their answers and their background and their circumstances. The concern about a public trial that will inspire veneer persons to be more honest and more trustworthy, we recognize it. It's one of the factors that the Supreme Court identified in Waller. But there's a point of diminishing returns as to when public exposure and a volume of people asking questions are going to inspire people to be honest. In this case, 25 or more people for the defense were able to end and did fully participate in this process. Although it was technically closed. There's defense attorneys and they're paralegals or jury consultants. That's not the public. And we are not, we are not... I should understand there's diminishing returns, I argue. So it's either the public's in or out. It's not even a little bit of the public comes in or a lot of the public comes in. They were either in or out. In this case, they were barred 100%. And the reason why I raise this issue, Judge, is not to say that the public was given access by way of their lawyer and staff. What I'm saying is that this court is trying to assess the fundamental fairness of the proceedings and the fundamental fairness of the entire proceedings and even the fundamental fairness of the jury selection process itself. There is no evidence. There is no indication that there was anything fundamentally unfair about the jury that was selected in advocating their rights. It's like proving a negative. Because you can't prove that there would have been a different result because folks weren't allowed in. Which also gets to another point, Your Honor, is there's no indication anywhere in the record that anybody wanted to get in. This is, in many respects, a hypothetical question. This court issued an order on a Friday and no defense counsel objected. What's the average civilian going to do? They come to a courtroom and it says, you can't come in. They knock on the door and say, I want to lodge an objection. Is that what you're looking for? I mean, the court order itself identifies unless there is the authorization of the court what I would expect which would happen in almost all these circumstances is they notify the lawyer. They would say, hey, I wanted to get in. I couldn't get in. Was there any sign up that this courtroom is closed to the general public? Does the record show that? The record does not show that. The record does not show that this, other than being on the docket, that this was communicated to anybody. It would be on the docket. One question on the closing of the courtroom. Mr. Goldberger distinguishes Weaver on the basis that was an ineffective assistance of counsel claim. What's your response on that? And with Weaver what the court had to answer was what the court answered at the very end of its decision was whether the proceeding itself was fundamentally unfair. Although prejudice was a concern obviously because it was a strickling analysis of ineffective assistance of counsel. At the end the court said let's analyze this whether the trial itself was fundamentally unfair. And it was the Supreme Court's decision in Weaver that said this trial was not fundamentally unfair. That we respectfully submit to the court is that not every court closure, particularly not every court closure involving Bois D'Ir implicates substantial rights and then certainly doesn't render all proceedings fundamentally unfair. How do you distinguish our situation from Negron Sostre? I would distinguish it in a couple of respects. In Negron Sostre long trial in a courthouse I think it was a three month trial many witnesses very serious concerns. The court closed the courtroom so obviously similar. The important difference between Negron Sostre was it relied upon First Circuit authority and when you unravel the First  authority it relies on Owens which essentially got to the point of saying if there is structural error then it's automatic that there is an effect on substantial rights. I would ask the court to examine this matter deeper with respect to Negron Sostre because what happened after Negron Sostre is the Supreme Court decided it recognized that not every structural error is the same. They outlined in great detail how you could have a courtroom closure and not affect the fairness of the defendant's trial. More importantly I would ask the court to look at I believe it is Lesner it's a First Circuit case that is after yes Lesand versus United States it's 898 Fed 3rd 115 it's a 2018 First Circuit case. Just for the point to say Negron Sostre was decided Supreme Court came out with Weaver and then in Lesand the First Circuit itself recognizes that Owens which was the basis for the application of Weaver to this particular case. With the court's concerns it was the judicial officer that made the decision. When you're making a decision upon rendering an entire proceeding fundamentally unfair. When you're making a decision as to vacate an entire trial because it impugns  integrity and reputation of the proceedings ask the court to consider the broader context of the way this happened. This was a trial that there were many issues. There was a lot of litigation and work between the parties coming to a fair result. I would highlight for the court another anecdote which might not be clear from the record. At the conclusion of the trial I think it was the last day of deliberations before the verdict was returned. The judge raised the issue of how to return the verdicts. We got 12 defendants. There had been reports that made their way through to the U.S. Marshal Service of a proposed riot that was going to take place in the courtroom if the  was returned in a systematic way with shackles and other things to be concerned and look at the transcript from that day to see what Judge Cain did. She spoke and said I'm coming up with a solution but I want to get your input. The judge walked in and that  moved to a different part of the courthouse so they couldn't communicate their verdicts one by one. That's exactly how it's supposed to be. When you're stuck with courthouse constraints you're supposed to work together. The judge with a courtroom constraint problem with closure said in a Friday afternoon order I'm closing it because of courtroom constraints but then nobody says anything for three days, four days, the entire trial. Nobody says anything in regard to it. Respectfully looking at the track record of the way Judge Cain managed to address similarly difficult problems and listen to counsel and responded appropriately in fashion to fair remedy this would have been resolved too if it had been appropriately raised at the time. It was not. There is a fundamental concern with plain error and plain error essentially deals with a defense counsel not raising an issue in a timely fashion. In the first line of questions the defense counsel the first line of questions the court raised for Mr. Goldberg suggested why didn't they object? Why didn't you act? I'm not impugning the accuracy or the legal acumen of any member of the defense counsel but I will suggest this that the plain error standard applies particularly because of this problem. As the Supreme Court said in Pluckett one of the first reasons for plain error the court said we are concerned about lawyers gaining the system. This court said when one defense lawyer did not object and the Bansal case is very similar in facts to this case. One lawyer did not object and this court came out and said I quote this is a classic example of sand bagging of the trial judge. That's the concern and it's reflected in other cases. I believe in green this court in an example the defense lawyer does not object they become complicit in the error. What does that mean? The importance of this is not that any of that happened here. But the importance is this court has to make a decision about fairness and integrity and public reputation of proceedings. If this court were to through plain error allow a new trial under these circumstances it would create a perverse incentive for defense counsel to sit on their rights. A perverse incentive for defense counsel to sit on their rights and wait. We've got a new trial ticket in our pocket and we're going to sit here and watch this trial proceed. If our client walks he walks. If he doesn't I can pull it out through plain error and say this is I'm now entitled to a new trial. That perverse incentive should not be what applies in this case. I think you agree with me earlier. It's equally incumbent on the United States court to sit on their rights and  for the trial to proceed. I think we should sit here and watch this trial proceed. I think we should sit    and for the trial to proceed. I respectfully submit with respect to defendant Kelly and his objection. It was not in any way shape or form addressing what the real problem was. The real problem essentially was taking small quantities and adding them up. In this particular case, the argument raised by the defense was not that. There is no reference to aggregating weights improperly. With respect to defendant argument that he properly raised this issue and preserved it, again, look at the transcript of his argument. It makes it clear that he is raising issues concerning drug weights and details associated not to get to the point of making a row argument, but getting to the point to say these witnesses were not credible because they didn't identify drug weights or locations. For those purposes, we submit the plain error analysis should apply for this. With respect to count three, it was plain. There was error. It does not affect substantial rights. The defendant's sentences are totally concurrent for every one of these defendants who have raised this concern. The statutory max, so to speak, is capped by the discrete offenses as opposed to aggregating the defenses under a 21. And part of our argument is contingent upon this court affirming the convictions of count one and count two. Assuming there is a problem with count one or count two, there would be a substantial effect on rights. But for this case, because count one and count two are grounded in solid, the fact that defendants received concurrent sentences at count three results in zero collateral consequence. Zero collateral consequence to these defendants. There was some suggestion that the concurrent sentence doctrine is no longer alive. That is not true. It is still alive. The concurrent sentence doctrine went by the wayside for a period of time because when the assessment and cost became applied to every  if each court were to change the statutory maximum at count three from life down to 20 years, there would still be an assessment. Each defendant will suffer the same consequence as a result. Under plain error review, there is no effect on substantial rights. There is a clarification I have to make. I believe with respect to Angel Shug's brief, they should be included. They are specifically identified in the statute. The cost is not the overtime costs. I think the position we made was the record is insufficient. There are potentially accounted for in the cost. We recognize that it wasn't fully that the process associated with accruing costs wasn't followed. The overtime costs. I think the argument you made earlier with respect to the Batson issue will be in response. I'm out of time. I can address it in more detail. Thank you. I'd first like to correct one thing that my friend said, which is that the drug conspiracy as defined in count two is  a listed recall objective in count one. So count one falls with count three, the capping of count three. The drug conspiracy also causes count one to be capped by itself without regard to how you rule on the application of road to conspiracy counts. I think I understand you. I was going to talk about the government's equal responsibility to object and I but I and I wouldn't say it having already discussed it except that I was surprised to  sandbagging argument made address the sandbag. There's no suggestion of sandbagging. I mean, the government suggestion. Yeah. I mean, there is no indication of sandbagging. There was no objection. There was no same issue. Right. That's right. But there's no I think what he was saying was a decision in your favor may lead to future sandbagging. That's what I heard him say. That is an argument against the plain error rule. That's not an argument. I don't think he alleged sandbagging. I think he specifically said he was not making an accusation of sandbagging. Well, and then he went ahead and And then talked about sandbagging. Okay. So, right. So, just to put in context the failure to object a little bit, if you look at page 30 of the CISDRUNK appendix, which is where the docket is found in our shared appendices, you'll see on page 30 that nine orders were submitted with all that came in at the same time. Which page is that? Page 30 of the Atkinson No, CISDRUNK. CISDRUNK, is it? No. I think it's Atkinson that actually produced the appendix that has the docket in it. Okay, CISDRUNK. The appendix that we shared that has the docket in  which is where the docket is entered, and I can understand how it was missed. I'm not making excuses, but the multiple prosecutors missed it, the multiple defense lawyers missed it. I can't see. If we agree with your position on closing the courtroom, do we need to reach any of the cases that the court might give for a case that's likely to be resolved on remand without a new trial? We don't have to, but you don't have to. That's right. So I just want to conclude by saying the government agrees with us that the proper prosecution of prejudice are affected, and that it's the fourth prong with the multiple factors that should be considered. So the factors, most of them being the same ones articulated in Waller, the fact that this came directly from the judge, not from the court.          in the same way that the judge has not been prosecuted in the same way that the judge           judge has not been prosecuted in the same way that the judge has not been prosecuted in the same